IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MICHAEL COUSIN,                         )
                                        )
                 Plaintiff              )
                                        )
        v.                              )      1:16-cv-365 (LMB/JFA)
                                        )
UNITED STATES OF AMERICA, et al.,       )
                                        )
                 Defendants.            )

MEMORANDUM OPINION

## I.      BACKGROUND

On April 4, 2016, Michael Cousin filed this employment discrimination action against the United States of America, the United States Department of Homeland Security, the Secretary of Homeland Security,[1] and other individual defendants in response to his removal from the federal service after being designated unfit for duty. Compl. [Dkt. No. 1]. Defendants have filed a Motion for Summary Judgment [Dkt. No. 51] to which plaintiff has responded. For the reasons that follow, the motion will be granted.

## II.     PROCEDURAL HISTORY

Plaintiff was formally removed from his position as a Customs and Border Patrol Officer ("CBPO") and from federal service effective December 15, 2012. Removal Letter, Def. Ex. P [Dkt. No. 51-16] at 1. He appealed the Customs and Border Patrol Agency's ("CBP" or "the Agency") termination decision to the Merits Systems Protection Board ("MSPB"). An

---

[1] When the complaint was filed on April 4, 2016, it named Jeh Johnson, then the Secretary of the U.S. Department of Homeland Security, as a defendant. [Dkt. No. 1]. On January 26, 2017, defense counsel filed a Notice of Substitution indicating that John Kelly, the current Secretary, "in his official capacity, is hereby substituted as a party defendant for the former DHS Secretary, Jeh Johnson." [Dkt. No. 71] at 1.

administrative judge conducted an evidentiary hearing regarding plaintiff's MSPB appeal on

June 19, 2013, at which plaintiff was represented by counsel. After hearing the evidence

presented, the administrative judge issued an initial decision affirming the removal. MSPB

Order, [Dkt. No. 20-2] ¶ 5. The MSPB affirmed the decision of the administrative judge, id. ¶ 1,

and plaintiff then filed a petition with the Equal Opportunities Employment Commission

("EEOC"), seeking review of the Final Order of the MSPB as it pertained to his discrimination

claim. EEOC Decision, [Dkt No. 20-3]. After briefly summarizing the facts, the EEOC affirmed

that "the MSPB's decision in the instant matter constitutes a correct interpretation of the laws,

rules, regulations, and policies governing this matter and is supported by the evidence in the

record as a whole." Id. at 3.

Plaintiff timely filed his appeal of that decision in this court seeking de novo review.

[Dkt. No. 1]. Plaintiff's complaint initially alleged claims against the Department of Homeland

Security under the Rehabilitation Act as well as raising tort claims against the individual

defendants. Id. With the exception of the Secretary of Homeland Security, all the individual

defendants have been dismissed from this lawsuit, and the only remaining claim is the one

arising under the Rehabilitation Act. Pending before the Court is the defendants' Motion for

Summary Judgment. [Dkt. No. 51]. Plaintiff belatedly filed a response, [Dkt. No. 63], and

appeared for oral argument. Although plaintiff objects to the defendants' characterization of the

facts, he has not submitted evidence that creates a dispute of material fact sufficient to defeat

summary judgment;[2] therefore, in reviewing this motion, the Court relies upon the

administrative record as introduced by the defendants.

---

[2] Plaintiff's response brief consists solely of argument and fails to offer any supporting evidence.
[Dkt. No. 63]. Following oral argument, plaintiff submitted supplemental briefing. [Dkt. No. 67].
This too was almost entirely argument; however, plaintiff did include a copy of an exhibit

## III.   FACTUAL BACKGROUND

It is undisputed that Cousin was an employee of the Agency for sixteen years (from July 1996 to December 2012) and most recently worked as a CBPO. Uncontest. Facts [Dkt. No. 52] ¶ 1. Cousin transferred to the Reston, Virginia site in 2007 after previously serving in the same role in St. Thomas, U.S. Virgin Islands. Pl. Opp. at ¶ 4(b). In Reston, plaintiff was employed as a "targeter" at the Agency's National Targeting Center where his job entailed "[managing] and [coordinating] identification of potential terrorists and instruments of terror and [performing] layered enforcement activities relative to counter-terrorism." Uncontest. Facts [Dkt. No. 52] ¶ 1. This position was classified as a GS-13 and required plaintiff to maintain a top secret security clearance, satisfy medical standards, and carry a service weapon. Pl. Opp. at ¶ 4(b); Uncontest. Facts [Dkt. No. 52] ¶ 1.

Plaintiff alleges and defendants do not dispute that on Wednesday, January 18, 2012, he was approached by the acting watch commander, Chris Smith, who asked plaintiff how he was doing. Pl. Opp. ¶ 4(b). Although the exact words used are somewhat in dispute, it is uncontested that plaintiff referenced suicide. Plaintiff asserts that he responded. "I would have been better off if I contemplated suicide, rather than contemplating a transfer to here." Id.; Cousin Tr. 24:3-6, Def. Ex. Q [Dkt. No. 51-17] ("I said I would have been better off if I had contemplated suicide rather than transferring in to this place with a smile and a joke."). The plaintiff contends that his comment was humorous, Pl. Opp. at 5, but Smith—who had taken multiple suicide awareness

---

introduced by the defendant, Def. Ex. E [Dkt. No. 51-5], and a July 18, 2012 memorandum from the Agency's Miami Field Office to Troy Miller, Executive Director of the National Targeting Center entitled "Request for Reassignment for Michael Cousin" [Dkt. No. 67-2].

trainings over the course of his career—did not interpret it as a joke. Uncontest. Facts [Dkt. No.

52] ¶ 2; Smith Tr., Def. Ex. B [Dkt. No. 51-2] at 31:11-22.[3]

After Smith asked Cousin follow-up questions and heard his statements about his

personal and professional frustrations, the chief watch commander, Smith, and another watch

commander invited Cousin into a conference room to discuss his comment in private. Smith Tr.,

Def. Ex. B [Dkt. No. 51-2] at 12:8-12; 14:10-19. After the conversation, the chief watch

commander set up a telephone call between plaintiff and the Employee Assistance Program

(EAP). Then, Smith and two other officers—Wade Smith and Georgiana Raimos—followed

plaintiff to his residence to retrieve his service weapon. Id. at 15:1-16:2; id. at 23:5-7. As a result

of the January 18, 2012 incident, Cousin was placed on light duty, his Top Secret security

clearance was suspended, and he was not permitted to carry a firearm. Feb, 24, 2012 Letter, Def.

Ex. D [Dkt. No. 51-4].

Plaintiff does not dispute that at the time of the incident he had been working "all hours

available," so much so that as of the day of the incident, he was too high on the overtime list to

take additional overtime hours. Cousin Tr., Def. Ex. C [Dkt. No. 51-3] at 11:16-22. His family,

which included his wife, two step-children and one biological child, were living in Medellín,

---

[3] Plaintiff attacks the credibility of Smith, arguing that Smith has "a history of falsifying
situations to meet his own needs." Pl. Opp. at 5. Specifically, he claims that "Smith falsely
claimed that the Plaintiff expressed suicidal thoughts to him on at least two other occasions." Id.
This line of argument is irrelevant. Plaintiff does not deny that he made a statement referencing
suicide on January 18, 2012, nor does he deny that in response to the comment the Agency
instructed him to complete a fitness for duty evaluation. See generally Pl. Opp. Therefore, the
Court need not make any credibility determinations, nor are such determinations appropriate for
summary judgment, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). That said,
Smith is not the only CBPO to report hearing plaintiff make suicidal comments or to take those
comments seriously. In a report submitted to the MSPB, a psychologist hired by plaintiff
explains that, Christopher Danzo, a colleague plaintiff named as a reference, stated that plaintiff
had made suicidal comments on numerous occasions dating back to 2007 and Danzo had
reported at least one of those comments to plaintiff's watch commander. See infra at 20.

Columbia, his wife's home country. Id. at 12:3-14. His wife's distance and his attempts to adopt

the two-step children and arrange for the family to be reunited in the United States were

significant sources of stress at the time. Seth Evaluation, Def. Ex. N [Dkt. No. 51-14].

On February 2, 2012, the Agency instructed plaintiff to report for a fitness for duty

examination, which the plaintiff underwent on February 10, 2012. Feb, 24, 2012 Letter, Def. Ex.

D [Dkt. No. 51-4]. Following that initial examination, the Agency "determined that consultation

with a psychiatrist [was] required" and instructed plaintiff to report to Richard Blanks, M.D., for

a psychiatric examination. Id.

Fitness for duty examinations for Agency employees were conducted by private

physicians. The Department of Homeland Security contracted with Comprehensive Health

Services ("CHS"), which scheduled examinations, administered the paperwork, and provided a

medical recommendation for fitness for duty evaluations to the Agency. David Shaler Aff., Def.

Ex. E [Dkt. No. 51-5]. Under the contract, CHS "was required to ensure that examining

physicians held current board certifications that were valid in the United States" and

"[p]hysicians performing psychiatric consultation services were required to be certified by the

American Board of Psychiatry and Neurology." Id. ¶¶ 13-14. The two mental health

professionals who evaluated plaintiff for the defendants, Drs. Blanks and Prunier, were certified

when they performed their evaluations. [Dkt. No. 50].[4]

_____

[4] As Dr. Blanks testified before the MSPB, he was in good standing with the D.C.,
Massachusetts, and North Carolina licensing authorities in March 2012 and was not under the
influence of alcohol or anything that could have affected his judgement. Tr. 78:1-8. He also
explained having a problem with alcohol abuse in 2003, which he reported to the North Carolina
licensing board. His license was suspended for six weeks, and he completed a five-year
monitoring contract without any problems. Id. at 76:19-77:22. When he evaluated plaintiff, his
license had been fully reinstated for several years. Id.

Dr. Blanks, a board certified forensic psychiatrist practicing at George Washington University Hospital, Blanks Tr., Def. Ex. G [Dkt. No. 51-7] at 76:8-12, interviewed plaintiff on March 5, 2012, for 1.5 hours. According to Dr. Blanks' description of the interview, plaintiff

> reported many times that he "hates" his job. In particular, he stated that it is a "mindless and mind-numbing" position, and despite his efforts, he cannot get transferred out of the current position. He feels that there are no "growth opportunities" in his job, he has tremendous "disdain" for his job, and he "committed suicide once by transferring into this job." . . . He stated that management at his job is "corrupt" and they treat him and others in a very unfair manner. He reportedly cannot get a transfer due to their "corruption."

Blanks Report, Def. Ex. F [Dkt. No. 51-6] at 5.

As to psychiatric history, plaintiff denied a history of mental health treatment but reported that he had twice sought help from the EAP. Id. at 6. "The first time, which was in late 2009 or early 2010, he sought it out because he 'hated' his job and he was very frustrated with his work. He reported that around that time, he intentionally was saying 'stupid' things at work in hopes of generating a 'stupid' reaction. For example, he reportedly told his managers that 'now is not a good time for me to have a weapon' just to arouse attention." Id. The second time was in November 2011. Id. "He stated that 'through my hate of my job and my distemper, I thought I developed an eating disorder.' He reported that he has gained over thirty pounds since August 2011 to the present time," despite undergoing a bariatric sleeve procedure for obesity in February 2010. Id.

With respect to current symptoms and activities of daily living, plaintiff reported to Dr. Blanks that he worked every day and, when not at work, sat around his house. Id. at 7.

> In terms of his current symptoms, he reported poor sleep, increased appetite (with a thirty pound weight gain in the past six months), decreased energy, poor concentration and a loss of interest in activities that he used to find pleasurable. He described his mood as "sad" most of the time. . . . Most concerning, he

6

reported that he has "thoughts" that "life would be better without me." Although he indicated that he would never act on such thoughts of hurting himself, he did say several times that he is "not afraid to die."

He indicated that "I wish I drank more." When I asked him to explain that remark, he indicated that he thought that the excessive consumption of alcohol might stabilize his mood. He reported that he is not a social person and could not name any non-work friends (and even these individuals are colleagues and not friends). He has become more isolated and withdrawn, and wishes to be reunited with his family, although he cannot imagine a scenario where that will ever happen.

Id.

In his assessment of plaintiff's mental status at the time of the interview, Dr. Blanks observed,

He was pleasant and cooperative. . . . Early in the interview, he asked if it would be OK for him to joke around with me. I explained that unnecessary joking around in this context would not be helpful, but he did so several times during the interview. He described his mood as "pretty good" and his affect was appropriate to the context. He denied any suicidal or homicidal thoughts, as well as any auditory or visual hallucinations. . . . His judgment and insight are poor.

Id.

Dr. Blanks concluded that plaintiff's statements about self-harm, which plaintiff claimed were made to get a response out of his colleagues, "appear to be a manifestation of several different variables at once: 1) untreated depression, 2) inappropriate interpersonal skills (which include inappropriate jokes in a work context), 3) long-standing job frustration, and 4) frustration over being separated from his wife and children." Id. at 7-8. According to Dr. Blanks, because it was very difficult to tell which of these variables is the primary motivator for any particular statement, "such statements must be taken seriously and at face value." Id. at 8.

In conjunction with his interview with Dr. Blanks, plaintiff completed a Minnesota Multiphasic Personality Inventory-2 (MMPI-2) questionnaire, which consisted of 567 questions

7

that were blindly graded by Dr. Richard Frederick, a psychologist and nationally recognized

expert in MMPI-2 assessment, Prunier Tr., Def. Ex. O [Dkt. No. 51-15] at 462:17-463:4. Dr.

Frederick's report, which was quoted at length by Dr. Blanks, established that the test was a

"valid assessment," as plaintiff's responses were "consistent and reliable." Id. at 3. In the

category of emotional control, plaintiff "appear[ed] to be significantly depressed, but he feels

victimized and blames others, perhaps his workplace, for inducing the depressed feelings. . . . He

is reporting much agitation—much anxiety, inability to concentrate or focus, constant rumination

about failing." Id. As to behavioral control, Dr. Frederick wrote that plaintiff "does not appear

particularly impulsive currently, and, although he had ample opportunity to endorse items related

to suicidality, he did not." Id. With respect to mental control, "He is reporting a great deal of

trouble with focus and concentration, but this seems related to tension and a constant seething of

anger." Id. at 4. In summary, Fredericks concluded, "This individual is dejected and bitter. . . .

He is seemingly incapable of dealing with anger, he turns it inward, and he has developed some

significant dejection and depression." Id.

 Based on his review of the available documents, including "the objective findings of the

MMPI-2," and his 1.5 hour interview with plaintiff, Dr. Blanks concluded that plaintiff met the

criteria for Major Depressive Disorder according to the Diagnostic and Statistical Manual of

Mental Disorders ("DSM-IV-TR" or "DSM"). Id. at 8. As Dr. Blanks explained,

> The DSM requires that five (or more) of the following symptoms have been
> present during the same two week period and at least one of the symptoms is
> either a depressed mood or loss of interest or pleasure in activities: 1) depressed
> mood most of the day, nearly every day; 2) markedly diminished interest or
> pleasure in most activities most of the day; 3) significant changes in appetite
> resulting in significant weight gain or weight loss; 4) sleeping too much or too
> little nearly every day; 5) psychomotor agitation or retardation; 6) fatigue or loss
> of energy nearly every day; 7) feelings of worthlessness or excessive or
> inappropriate guilt nearly every day; 8) diminished ability to think or concentrate
> nearly every day; or 9) recurrent thoughts of death, recurrent suicidal ideation

without a specific plan, or a suicide attempt or a specific plan for committing suicide."

Id. Dr. Blanks' evaluation indicated that plaintiff exhibited eight of the nine symptoms, in that plaintiff was

[1] "sad" most of the time, [2] has lost interest in most activities, [3] has gained thirty pounds in the past six months, [4] has poor sleep, [6] has decreased energy, [7] has expressed feelings of worthlessness, [8] has poor concentration, [9] and has had recurrent thoughts of death and/or suicidal ideation (but did not report any specific intent or plan to act on these thoughts).

Id. at 9. In addition, "because [plaintiff's] depression presents itself primarily as anger, impulsivity, and sarcasm," Dr. Blanks opined that "at the present time, the employee does present a threat to himself or others." Id. "[H]e is very unstable from a psychiatric perspective; and his escalating and cumulative anger could cause him to act out in threatening ways." Id. Building on this conclusion, Dr. Blanks' evaluation stated that plaintiff did not have the ability to (a) "[u]se proper judgment to make quick decisions in law enforcement situations to protect the lives of self, the public, and other law enforcement personnel;" (b) "[c]arry a government-issued weapon;" or (c) "[w]ork extended hours, rotating shifts and unscheduled overtime." Id. With respect to plaintiff's prognosis, Dr. Blanks opined that it was "likely quite poor unless [plaintiff was] willing to engage in an intensive course of psychotherapy for a minimum of six months. In addition he would likely benefit from a trial of medication to help with his symptoms." Id. at 10.

After receiving Dr. Blanks' report, the Agency asked Paul Prunier, M.D., their contracted Medical Review Officer,[5] to review it. Dr. Prunier concluded that the evaluation was "[c]redible and complete" and that the basis for Dr. Blanks' diagnosis of Major Depressive Disorder was

---

[5] "As the Medical Review Officer, Dr. Prunier was responsible for reviewing the examining psychiatrist's evaluation, assessing whether the diagnosis [was] supported by the information presented, and rendering a final written recommendation." Shaler Aff., Def. Ex. E [Dkt. No. 51-5] ¶ 19.

9

"well documented in the report." Mar. 21, 2012 Review, Def. Ex. H. at 1. After summarizing Dr.

Blanks' key findings, Dr. Prunier concurred in his assessment that the plaintiff "should be

considered psychiatrically NOT FIT FOR DUTY." Id. at 2 (emphasis in original). Dr. Prunier

added that, "given the employee's reported passive-aggressive style, his significant anger, and

his desire 'to get even', . . . he cannot currently be trusted to efficiently and effectively perform

even light duty functions." Id.

On March, 23, 2012, plaintiff was placed on administrative leave. Removal Proposal,

Def. Ex. P [Dkt. No. 51-16] at 1. The Agency's Office of Human Resources subsequently asked

Dr. Prunier to clarify his assessment of plaintiff's fitness for light duty. Apr. 12, 2012 Review,

Def. Ex. I [Dkt. No. 51-9] at 1. Dr. Prunier explained that given plaintiff's history of poor

judgment and insight, his anger, inability to concentrate, feelings of victimization, long-standing

job frustration, sarcasm, and impulsivity, "the employee is NOT able to safely, effectively and

efficiently perform even any light duty functions which include independent decision-making

functions or national security implications." Id. at 2. Dr. Prunier also added the caveat that

"given the employee's reported passive-aggressive style, his significant anger and his desire to

'get even', it [was Dr. Prunier's] professional opinion that [plaintiff] is currently NOT

trustworthy. This reviewer is concerned that his past behavior will escalate and that he may

develop a (conscious or unconscious) desire to sabotage through his work." Id.

In a letter dated April 30, 2012, from Denis Grenier, the Assistant Director of the

National Targeting Center, to plaintiff, Grenier "propos[ed] to remove [plaintiff] from [his]

position as a Customs and Border Protection Officer (Program Manager), GS-1895-13, and from

Federal service." Removal Proposal, Def. Ex. P [Dkt. No. 51-16] at 1. As the letter explained,

plaintiff's "non-disciplinary removal [was] being based on [plaintiff's] inability to perform." Id.

at 1-2. The letter summarized the requirements of a CBPO, namely, "mak[ing] highly significant judgments and utilize[ing] good decision-making skills in relation to the management and coordination of identifying potential terrorists and instruments of terror," "respond[ing] rapidly and appropriately to changing initiatives and threats," and "carry[ing] a weapon and maintain[ing] demonstrated proficiency with the use of a firearm as well as non-deadly force." Id. at 2. "Given the documentation of [plaintiff's] psychiatric state and the opinions of two qualified medical professionals, there is no other conclusion to be made: [plaintiff was] unable to perform the duties and functions of [his] position at [that] time and for the foreseeable future. In addition, given the totality of the medical documentation, there [were] no other positions in which [plaintiff] could perform productively." Id. at 2. The letter was hand delivered to the plaintiff, who refused to sign the acknowledgement of receipt. Id. at 3.

Following the proposed action, plaintiff, through his designated representative, Thomas Hennessey, provided a written response that included a five-page "Suicide Assessment" from Tina M. Roemersma, Ph.D. The assessment, dated July 16, 2012, stated that "[t]he purpose of this evaluation is to assess [plaintiff's] current emotional state and risk of suicidal ideation, plan, or intent." Def. Ex. J [Dkt. No. 51-10] at 1. The assessment drew on the Beck Suicide Screen; a three hour diagnostic interview conducted by Dr. Roemersma; a second MMPI-2 test, administered and scored by Dr. Roemersma; phone interviews with Diane Dunn, plaintiff's colleague, and Steve Elrich, his firearms instructor; a review of Drs. Blanks and Prunier's reports; and a Rorschach Projective Techniques-Exner scoring System test, also administered by Dr. Roemersma. Id.

As to plaintiff's socio-emotional functioning, Dr. Roemersma confirmed that plaintiff "displays a sarcastic sense of humor" and "does not discriminate when he should or should not

11

share his opinions." Id. at 3. She found that "[o]ther than a poor choice of words, there is a lack

of support that [plaintiff] had actually been contemplating suicide. While a previous psychiatric

evaluation is indicative of elevated levels of depression, he had been tested shortly after being

asked to leave a job." Id. According to Dr. Roemersma, during earlier periods of stress—such as

when plaintiff was separated from his wife—"he never expressed any known suicidal thoughts

nor had he ever acted in any manner to suggest suicidal ideation." Id. at 4. She also denied that

he was exhibiting feelings of hopelessness or worthlessness. Id. Though the report does not

specifically discuss the results of the Beck Suicide Screen, MMPI-2, or the Rorschach test, she

stated that the tests were negative for indices of depression and suicidal ideation. Id. She also

observed that plaintiff did not demonstrate any violence towards himself or others and does not

demonstrate recklessness or impulsivity. Id.

The Agency provided a copy of Dr. Roemersma's report to Dr. Prunier, who reviewed

the material and responded in a letter dated July 30, 2012, in which he observed that "[t]he

information reported by Dr. Roemersma, specifically regarding any history of suicidal ideation,

is contradicted by that provided by the employee directly to Dr. Blanks and in the information

provided during the MMPI-2 performed at the time of Dr. Blanks' evaluation." Def. Ex. K [Dkt.

No. 51-11] at 4. He also questioned whether the tests referenced in Dr. Roemersma's report were

completed before plaintiff's arrival at her office, a practice that was not an accepted standard and

suggested that Dr. Roemersma should disclose the results of the MMPI-2 test she administered.

Id. Dr. Prunier also challenged Dr. Roemersma's conclusion that plaintiff's earlier depression

when he saw Dr. Blanks was attributable to being asked to leave his job. Dr. Prunier pointed to

plaintiff's 2009 contact with the EAP—when he complained that he hated his job—and

significant weight gain as evidence that contradicted her conclusion. Id. at 4. He further added

that

> [a]lthough presenting information suggesting that the employee is not currently
> depressed, Dr. Roemersma does not directly address the information presented in
> Dr. Blanks' evaluative report. At that time, based upon all of the information
> available (see above), [plaintiff] certainly demonstrated evidence of Major
> Depressive Disorder. Although a Major Depressive Disorder is a potentially
> waxing and waning process, the employee has reportedly received no treatment
> since previously evaluated. . . . As such, without such care, this reviewer would
> maintain that [plaintiff] would likely continue to suffer from periodic episodes of
> depression. . . . Thus, despite the information provided by Dr. Roemersma, it is
> this reviewer's opinion that the employee remains both NOT FIT FOR DUTY as
> a CBPO and NOT able to safely, effectively and efficiently perform even any
> light duty functions which include independent decision-making functions or
> national security implications.

Id. at 6.

Dr. Roemersma responded to Dr. Prunier's letter in turn, explaining her evaluation

methods and reiterating her opinion that plaintiff was not exhibiting suicidal ideation, plan, or

intent when she assessed him on July 16, 2012. She clarified that the relevant tests were

administered in her office, verified that the results of the MMPI-2 she administered were valid,

reiterated that plaintiff's tests were all negative for depression or suicidal ideation, and stated that

she did not believe he needed to undergo therapy. Def. Ex. L [Dkt. No. 51-12] at 1-2.

Dr. Prunier reviewed Dr. Roemersma's response and reaffirmed his conclusion that

plaintiff was not fit for duty as a CBPO or for positions that included independent decision-

making or national security implications. Def. Ex. M [Dkt. No. 51-13] at 10. He added that Dr.

Roemersma's initial report was weakened by her failure to release more than a summary

statement regarding her test results. Id. at 9-10. Dr. Prunier also emphasized that Dr. Roemersma

again failed to "formally address the information gathered by Dr. Blanks;" however, Dr Prunier

modified his views about plaintiff to the extent that he found him able to perform duties of a

13

mission support services nature. Id. at 10. Dr. Roemersma was provided with a copy of this letter

but did not respond. Removal Letter, Def. Ex. P [Dkt. No. 51-16].

On September 12, 2012, plaintiff spoke with Employee Relations Specialist Mary

Brodsky regarding alternate employment opportunities with the Agency. Id. at 7. Plaintiff

provided Brodsky with a copy of his resume and she initiated a job search for vacant, funded

positions in plaintiff's local commuting area because it was her understanding that plaintiff could

not afford to move. Id.[6] Brodsky followed up, asking plaintiff to revise his resume to include any

duties involving assignments that were administrative or analytical in nature, demonstrating

professional experience that might expand the positions for which plaintiff was eligible. Brodsky

Tr., Def. Ex. W [Dkt. No. 66-4] at 392:4-22. Plaintiff never submitted an updated resume.

---

[6] During oral argument, plaintiff challenged the search parameters used by Brodsky. Plaintiff
claimed that he was willing to move beyond his local commuting area if the Agency paid for the
move. This is consistent with the evidence in the administrative record showing that plaintiff
repeatedly told Brodsky that he could not afford to move at his own expense. Sept. 19, 2012
Email, Def. Ex. Y [Dkt. No. 66-6] at 2. Brodsky explained to plaintiff that the Agency was not
obligated to pay for his relocation. Nov. 5, 2012 Letter, Def. Ex. V [Dkt. No. 66-3]; Brodsky Tr.,
Def. Ex. W [Dkt. No. 66-4] at 386:14-387:14. Therefore, the search parameters were limited to
his local commuting area.
    Plaintiff also represented at oral argument that he specifically requested several training
positions that he felt were within his qualifications. The Agency investigated this possibility but,
as Brodsky explained in her testimony before the MSPB, the positions in which plaintiff was
interested were CBPO positions that would require him to carry a weapon, something that he was
not qualified to do based on Dr. Prunier's recommendation. Brodsky Tr., Def. Ex. W [Dkt. No.
66-4] at 388:10-389:7.
    In supplemental materials filed after oral argument, plaintiff argues that he attempted to
discuss with Brodsky an unreimbursed transfer to a training position in West Virginia but was
rebuffed, and argues that he was seeking unreimbursed transfers before his suicide-related
comment on January 18, 2012, specifically to the Miami Field Office. [Dkt. No. 67] at 4.
Plaintiff introduces no evidence in support of this contention that he sought transfer to West
Virginia but, assuming it is true, it is inapposite. This position was for training and, as Brodsky
explained, plaintiff was not qualified to serve in such a role. Brodsky Tr., Def. Ex. W [Dkt. No.
66-4] at 388:10-389:7. Although plaintiff does introduce evidence that he applied for a transfer
to the Miami Field Office before the January incident, [Dkt. No. 67-1] at 6, this request has no
bearing on the Court's analysis because it does not rebut the record evidence indicating that as of
September 2012, plaintiff was unwilling to accept an unreimbursed transfer.

Removal Letter, Def. Ex. P [Dkt. No. 51-16]. In a letter dated November 5, 2012, the Agency offered plaintiff two positions that were consistent with the qualifications set forth in Dr. Prunier's last report and the skills reflected in plaintiff's resume. Nov. 5, 2012 Letter, Def. Ex. V [Dkt. No. 66-3]. One was a GS-7 position as a CBP Technician at Dulles International Airport. Advancement for this position was capped at the GS-7 level. Id. at 3. The other was a GS-5 position as a Mission Support Specialist at the Baltimore Field Office. Although this position was slightly outside of plaintiff's commuting area (58 miles as compared to the commuting zone of 50 miles), it provided advancement to a GS-12 level. Id. Plaintiff refused both positions, maintaining that the Agency's determination that he was medically disqualified from his CBPO position was without merit. Nov. 19, 2012 Letter, Def. Ex. BB [Dkt. No. 66-9].

In a December 6, 2012 letter from Donald Conroy, the Director of the National Targeting Center, plaintiff was informed that he would be removed from his position as a CBPO and from federal service effective December 15, 2012. Removal Letter, Def. Ex. P [Dkt. No. 51-16] at 1. The letter explained the basis for the removal:

> [T]he reason for the proposed action is fully supported and proven by a preponderance of the evidence. Although Dr. Roemersma does not believe you would harm yourself or others, she did not opine—nor is she in the best position to judge—whether you are fit to perform the full range and functions of your position. The independent medical examiner who interviewed you on March 5, 2012, Dr. Richard Blanks, J.D., M.D., wrote that at that time, you met the criteria for Major Depressive Disorder according to the Diagnostic Statistical Manual of Mental Disorders IV (DSM-IV-TR). He went on to say that due to your psychiatric instability, he did not believe you could safely carry a weapon or perform the full duties of your position in a professional manner. He wrote that he believed these restrictions would likely be permanent and that your prognosis for a full return to duty would likely be poor barring treatment that included psychotherapy and possibly, medication.
>
> Dr. Prunier, the Agency's Medical Review Officer, opined on multiple occasions after reviewing multiple records, including your submissions, that it is his professional opinion that you are not fit for duty as a CBPO nor should you perform functions that require independent decision-making or have national

security implications. Dr. Prunier's assessments were definitive. Given his knowledge of the Agency's mission as well as the medical and technical requirements of the CBPO position, [Conroy gave] his opinion more weight than Dr. Roemersma's opinion.

Id. at 2-3.

In plaintiff's appeal to the MSPB, he provided three additional assessments of his mental health. First was a September 17, 2012 evaluation by Malika I. Seth, M.D., of the Ashburn Psychological Services. Def. Ex. N [Dkt. No. 51-14].[7] The report was based on a psychiatric evaluation of plaintiff, a phone interview with Erich Nathan, a Program Manager for CBP and eight-year colleague of the plaintiff, and a review of the reports by Drs. Blanks and Prunier. Dr. Seth concluded that plaintiff was "psychiatrically 'FIT FOR DUTY' and at a low risk for harming himself or others." [Dkt. No. 51-14] at 1 (emphasis in original). In acknowledging that his conclusion differed from Dr. Blanks, Dr. Seth postulated, "[o]ne possible explanation for the striking difference in conclusions is the timing and contexts of the two evaluations. . . . [In February, plaintiff] was worried about losing his job and the consequences for himself and his family. Now that several months have passed since this incident, it is perhaps more clear that these symptoms were transient and expectable responses to stress, rather than symptoms indicative of Major Depressive Disorder." Id. at 1-2. Plaintiff acknowledged to Dr. Seth that he had expressed dissatisfaction with his current position on several occasions but denied feeling emotional agitation, hopelessness, or helplessness. Id. at 2. Nathan, plaintiff's colleague, expressed no reservations about plaintiff's judgment and said it was not in plaintiff's nature to be depressed. Id.

---

[7] Despite its September date, Dr. Seth's assessment was not submitted to the Agency before plaintiff's termination in December. Uncontest. Facts [Dkt. No. 52] ¶ 19.

With respect to his own assessment, Dr. Seth reported that plaintiff exhibited no suicidal or homicidal ideation, and observed that plaintiff's insight and judgment were good. In Dr. Seth's opinion, plaintiff did not meet the DSM-IV-TR criteria for Major Depressive Disorder because "he did NOT describe a two week period of sustained depressed mood or loss of pleasure in activities" (which, as Dr. Blanks explained, is a necessary symptom according to the DSM). Id. at 3-4 (emphasis in original). But, Dr. Seth did acknowledge that plaintiff exhibited weight gain, decreased energy, and impaired sleep and concentration, which plaintiff attributed to his employment concerns. As to the specific fitness for duty questions, Dr. Seth concluded that plaintiff was "NOT likely a potential threat to himself or others," could use proper judgment and make law enforcement decisions, carry a government issued weapon, and work extensive hours, rotating shifts, and unscheduled overtime. Id. at 4.

On April 10, 2013, nearly five months after being terminated, plaintiff met with David Fisher, M.D., of the Columbia Center for Occupational & Forensic Psychiatry. Def. Ex. R [Dkt. No. 51-18]. Dr. Fisher conducted a 2.5 hour psychiatric history and examination of plaintiff and reviewed the reports of Drs. Blanks, Prunier, Roemersma, and Seth. During the examination, plaintiff denied having a history of psychiatric issues and said that he had two sets of six counseling sessions with the EAP, the first of which was about job frustration and the second of which was related to an eating disorder. Id. at 10. He reported no history of self-injurious or violent behavior and denied any history of ideation, plan, or intent to harm himself or others. Id. at 11. As to his current state, plaintiff stated that he was not depressed, slept regularly, maintained a stable weight, had fair concentration, and that his self-esteem was intact. Id. Specifically, plaintiff described his level of anxiety was a 9 out of 10, where 1 is the most anxious and 10 the least anxious and described his level of depression was 10 out of 10, where 1

17

is the most depressed and 10 is the least depressed. Id. at 14. As to self-esteem, plaintiff reported

his self-esteem was a 9 out of 10 but claimed that he had a lot of insecurity. Id. at 20. He also

claimed that he was more optimistic than pessimistic. Id. The assessment indicated that there "is

no reported incidence of impulsive behavior at work" and "no past history of suicidal ideation,

intention, gestures, behavior, or attempts." Id. at 21.

    As to judgment, Dr. Fisher observed that the plaintiff had "problems with his ability to

understand and anticipate the likely consequences of his statements made at work. [Plaintiff] has

demonstrated lapses in judgment, specifically by verbally interacting inappropriately at work and

incorrectly assessing the interpersonal situation he found himself in at work. . . . It is noted that

although his verbal interactions have been at times inappropriate, his behavioral interactions

have been well controlled and there have been no reported incidents or complaints." Id. at 22.

    Dr. Fisher administered yet another MMPI-2 test, finding that plaintiff's responses were

"unrealistically virtuous," and explaining that this attitude "weakens the validity of the test and

shows an unwillingness or inability on the part of the client to disclose personal information." Id.

at 23. The results also indicated that plaintiff "may be somewhat intolerant and insensitive. On

retesting, pronounced complaints of depressed mood and low morale might become more

prominent." Id. at 24. Interpersonally, he had "an average interest in being with others and is not

socially isolated or withdrawn." Id. "He appears to be an individual who has rather cynical views

about life. Any efforts to initiate new behaviors may be colored by his negativism." Id.

    Despite these findings, Dr. Fisher did not make a diagnosis under the DSM, id. at 25-26,

concluding that plaintiff was not a threat to himself or others, could use proper judgment, make

law enforcement decisions, carry a government issued weapon, and work extensive hours,

rotating shifts, and unscheduled overtime. Id. at 28. He did add the caveat that plaintiff had "a

number of significant psychosocial stressors present. The overall severity of these psychosocial stressors is moderate to severe." Id. at 26. In particular, there were health problems in plaintiff's family because his wife had cancer, he had inadequate social support, lived alone, had recently lost his job, and had inadequate finances. Id.

Unique among plaintiff's doctors, Dr. Fisher provided a detailed engagement with Dr. Blanks' report, claiming that Dr. Blanks' diagnosis was "incorrect because (296.32) is the code for a recurrent depression, with a moderate degree of severity." Id. at 29 (emphasis added). In addition, Dr. Fisher argued, "It is not clear that [plaintiff] was, in fact, depressed when evaluated by Dr. Blanks because 'the mental status examination was noncontributory because almost all the findings were within normal limits—the only exception was that Dr. Banks [sic] noted that [plaintiff's] judgment and insight were poor (Dr. Prunier' report dated 3-21-12). Dr. Blanks specifically states that [plaintiff's] 'mood was pretty good and his affect was appropriate to the context.'" Id. Although Dr. Fisher made no attempt to identify the reasons for the differences between what he and Dr. Blanks observed about the plaintiff, he represented, "There is a marked inconsistency and discrepancy between the information supplied by Dr. Blanks in March 5, 2012 and my evaluation of Mr. Cousin on April 10, 2013." Id. at 29.

Finally, on April 8 and 9, 2013, plaintiff underwent a psychological evaluation by Fred M. Kerman, Ph.D. who administered a number of psychological tests, including another MMPI-2. He also conducted telephone interviews with Noel Langan, Christopher Candela, Christopher Danzo, and Robert Hodges, all colleagues of the plaintiff, as well as reviewing the reports of Drs. Blanks, Prunier, Roemersma, and Seth, a reference letter from a local library where plaintiff volunteered, and the position description for a CBPO. Def. Ex. S [Dkt. No. 51-19]. Dr. Kerman concluded that plaintiff's "response to the personality assessment revealed that he is not

19

currently experiencing a clinical depression. His score on the Beck Depression Inventory (raw score=0) revealed that he does not feel sad, is not discouraged about the future, enjoys daily activities and is not currently experiencing any sleep or appetite disturbance." Id. at 9. Plaintiff's coworkers Hodges (5-year relationship), Langan (3.5-year relationship), and Candela (3-month relationship) reported having a good rapport with him and observed that he tended to be sarcastic, but denied having heard plaintiff make suicidal comments. Id. at 9-10. Of significance was the report by Danzo, who had known plaintiff since 1995, that plaintiff had referenced suicide in his presence. Id. at 10. The first such comment was in 2007, when Danzo was a supervisor and informed the watch commander, who told plaintiff that he could contact the EAP. Plaintiff insisted that he was joking. Id. After Danzo heard plaintiff make another such comment, he advised him that such comments were not considered funny, but plaintiff continued to make suicidal remarks, although not as often. Id.

Dr. Kerman's report concluded that plaintiff "does not require any mental health treatment at the present time," did not have a diagnosis under the DSM-IV-TR, and denied that he was clinically depressed, concluding that "there was no evidence in the reports prepared by Drs. Roesmersa [sic] and Seth or the current evaluation that he ever displayed any suicidal intent, plan, or behavior." Id. at 12. He "does not present a threat to himself or others. He is psychologically responsible for all aspects of his personal and professional responsibilities and can safely perform all the functions of his position. [Plaintiff] is fit for full duty including handling confidential material and carrying a weapon." Id. at 12-13.

In plaintiff's petition for review before the MSPB, he argued that 1) he had recovered from any disqualifying condition during the pendency of his Board appeal; 2) the Agency committed disability discrimination; and 3) the Agency denied him due process because the

Agency failed to provide him with all of the medical reports that the deciding official considered. MSPB Order [Dkt. No. 20-2] ¶ 6. The MSPB concluded that "[t]he [A]gency proved its charge of inability to perform." Id. After summarizing the medical evidence, the MSPB observed that the account plaintiff provided to Dr. Blanks was in marked contrast to the accounts he provided to the four doctors he hired. Id. ¶ 13. The MSPB found that, "Whatever the reason for the discrepancy between the [plaintiff's] first clinical interview and his subsequent ones, the fact of the discrepancy leaves us doubting the validity of any of these assessments. . . . We agree with Drs. Blanks and Prunier that the [plaintiff] has demonstrated inability to use proper judgment and make quick decision in law enforcement situations. The [plaintiff's] major depressive disorder and impairment in judgment are disqualifying conditions." Id. ¶ 14 (internal citations omitted). The MSPB also found that plaintiff's evidence failed to show that he had recovered from his disqualifying condition, much less that he did not suffer from such a condition. Id. ¶ 19. Finally, the MSPB concluded, "Because the [plaintiff] has not shown that he was a qualified individual with a disability, he has not proven his disability discrimination claim." Id. ¶ 22. The EEOC affirmed this decision which is now on review in this civil action.

## IV.   DISCUSSION

### A. <u>Standard of Review</u>

Because plaintiff's complaint under the Rehabilitation Act is a "mixed case,"[8] the Court "must conduct a <u>de novo</u> review of any claims of discrimination or retaliation previously presented before the EEOC, while review of any non-discrimination claims presented before the MSPB is limited to the administrative record and is thus subject to a more deferential standard established by statute." <u>Luther v. Gutierrez</u>, 618 F. Supp. 2d 483, 490 (E.D. Va. 2009) (citing 5

---

[8] A "mixed case" is one "where the plaintiff challenges an action that allows him to seek review before both the MSPB and the EEOC." <u>Luther</u>, 618 F. Supp. 2d at 490.

U.S.C. § 7703(c)). Although the conclusions of the MSPB and EEOC regarding discrimination are not entitled to deference from the Court, de novo review is not an invitation for the Court to sit "as a kind of super-personnel department weighing the prudence of employment decisions." DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998). Instead, as in other employment discrimination contexts, the Court's task is to assess the employment decision from the perspective of the employer at the time the decision was made. Id. at 298-99 ("[W]hen an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." (internal quotation marks omitted)).

As in all civil actions, summary judgment is appropriate where the record demonstrates that "there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although the Court must view the record "in the light most favorable to the non-moving party," Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 324 (4th Cir. 2012), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to overcome a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); see also Am. Arms Int'l v. Herbert, 563 F.3d 78, 82 (4th Cir. 2009). Rather, a genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

Where the nonmoving party bears the burden of proof, the party moving for summary judgment may prevail by showing "an absence of evidence to support" an essential element of that party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322-25 (1986); see also Rhodes v. E.I. du Pont de Nemours & Co., 636 F.3d 88, 94 (4th Cir. 2011). Once the moving party has

successfully demonstrated that absence, the nonmoving party must "come forward with specific facts," rather than just "metaphysical doubt[s]" or conclusory allegations, that prove that there is a genuine dispute for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (internal quotations omitted); see also Erwin v. United States, 591 F.3d 313, 319 (4th Cir. 2010). The failure to do so "renders all other facts immaterial" and entitles the movant to summary judgment as a matter of law. Rhodes, 636 F.3d at 94. The court must "draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion;" however, "those inferences must, in every case, fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d 1317, 1323 (4th Cir. 1995) (internal quotations and citations omitted).

## B. Analysis

Pursuant to Section 504 of the Rehabilitation Act, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).[9] There are two schemes for

---

[9] "While both the Rehabilitation Act and Americans with Disabilities Act (ADA) are generally construed together and the analysis under both is similar, the Fourth Circuit has distinguished the causation requirement of each act, Baird ex rel. Baird v. Rose, 192 F.3d 462, 469 (4th Cir. 1999), and has held that to state a claim for relief under the Rehabilitation Act, a plaintiff must allege "that he was excluded from the . . . benefit due to discrimination solely on the basis of his disability." Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1265 (4th Cir. 1995) (emphasis added). In contrast, to state a claim for relief under the ADA, a plaintiff must allege that his disability "was a motivating factor" for excluding him." Krieger v. Loudon Cty., No. 5:13CV073, 2014 WL 4923904, at *4 (W.D. Va. Sept. 30, 2014) (citing Baird, 192 F.3d at 470), aff'd sub nom. Krieger v. Virginia, 599 Fed. App'x 112 (4th Cir. 2015). Other than this difference regarding the causation requirement, the case law as to the Rehabilitation Act and ADA is consistent.

analyzing discrimination under Section 504. See E.E.O.C. v. Kinney Shoe Corp., 917 F. Supp.

419, 424 (W.D. Va. 1996), aff'd sub nom. Martinson v. Kinney Shoe Corp., 104 F.3d 683 (4th

Cir. 1997). First, if the employer disclaims reliance on the disability in its employment decision,

and instead offers other reasons for its adverse action, courts employ the burden-shifting scheme

established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Conversely, if the

employer does not disclaim reliance on the disability, McDonnell Douglas becomes inapplicable

and courts employ the three-prong test developed in Tyndall v. National Educ. Ctrs., 31 F.3d

209, 212 (4th Cir. 1994). Under this test, a plaintiff must establish that (1) he or she has a

disability; (2) he or she is otherwise qualified for the job; and (3) the adverse employment action

constitutes unlawful discrimination on the basis of the disability. Tyndall, 31 F.3d at 212. Here,

defendants do not contest that plaintiff's termination was based on his "psychiatric state" and

plaintiff's proposed removal letter explained that he could "apply for disability retirement,"

Removal Proposal, Def. Ex. P [Dkt. No. 51-16], therefore, the plaintiff's complaint will be

evaluated under the Tyndall framework.

    With respect to the first element, defendants do not dispute that plaintiff suffers from a

disability.[10] Ironically, it is the plaintiff who insists that he is not disabled, instead arguing that

defendants erroneously perceived him to be so. The parties' dispute is not material as to the first

element because "the Act protects not just the actually disabled, but also those who are merely

regarded as disabled." Serrano v. Cty. of Arlington, 986 F. Supp. 992, 996 (E.D. Va. 1997). The

statutory definition of "disability" includes "being regarded as having [a physical or mental

---

[10] The Rehabilitation Act defines a disability as "a physical or mental impairment that
substantially limits one or more major life activities." 29 U.S.C. § 705(9)(B). ADA regulations
define "substantially limits" as meaning "significantly restricted in the ability to perform either a
class of jobs or a broad range of jobs in various classes as compared to the average person having
comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i).

impairment that substantially limits one or more of the major life activities.]" See 42 U.S.C. §

12102(2)(C). This definition recognizes that "society's accumulated myths and fears about

disability . . . are as handicapping as are the physical limitations that flow from actual

impairment." See School Bd. of Nassau County, Fla. v. Arline, 480 U.S. 273, 284 (1987).

According to EEOC regulations, "a person is 'regarded as' having a substantially limiting

impairment if the individual (1) has an impairment that does not substantially limit major life

activities, but is treated by an employer as having such a limitation; (2) has an impairment that

substantially limits major life activities only as a result of the attitude of an employer toward

such impairment; or (3) has no impairment, but is treated by an employer as having a

substantially limiting impairment. " Serrano, 986 F. Supp. at 996–97 (citing 29 C.F.R. §

1630.2(*l*)); see also Betts v. Rector & Visitors of Univ. of Virginia, 18 Fed. App'x 114, 118–19

(4th Cir. 2001) (holding that plaintiff satisfied the first element when, despite the court's

conclusion that the plaintiff was not actually disabled, the record established that the defendant

regarded the plaintiff as having a disability). Given the definition of disability, the Court need

not determine whether plaintiff actually has a disability because his papers recognize that, for

purposes of the Rehabilitation Act, he is "disabled" under the third category. Pl. Opp. at 1 ("This

action is not about any disability that I have, because I have none and never had. Any disability

that the United States alleges is a perceived disability that was concocted by its employees for

reasons best known to them.").

　　As to the second element, which is the heart of this case, a person who is "otherwise

qualified" is one who could "perform the essential functions" of his position "with or without

reasonable accommodation" from his employer. See 42 U.S.C. § 12111(8). The Fourth Circuit

has defined "essential functions" as "functions that bear more than a marginal relationship to the

job at issue." Tyndall, 31 F.3d at 213. "Evidence relevant to whether or not a function is essential includes the employer's judgment, written job descriptions, the work experiences of current and former employees, the amount of time spent performing that function, and the consequences of not requiring the prospective employee to perform that function." Serrano, 986 F. Supp. at 1000–01 (citing 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n)(3)). The plaintiff bears the burden of establishing that he is a qualified individual with a disability by showing: (1) whether he "could perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue," and (2) if not, whether "any reasonable accommodation by the employer would enable [him] to perform these functions." Tyndall, 31 F.3d at 213. The Rehabilitation Act also includes an important exception, providing that an individual is not otherwise qualified if he poses "a direct threat to the health or safety of other individuals in the workplace," 42 U.S.C. § 12113(b); Doe, 50 F.3d at 1265, or poses a risk to himself, 29 C.F.R. § 1630.2(r).[11]

To establish that he is "otherwise qualified," the "plaintiff must do more than demonstrate that [his] employer's belief is incorrect; plaintiff must present evidence reasonably calling into question the honesty of [his] employer's belief." Tomasello v. Fairfax Cty., No. 1:15-CV-95, 2016 WL 165708, at *11 (E.D. Va. Jan. 13, 2016). This is because "'[i]t is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff."

---

[11] As this court explained in Brooks v. Micron Tech., Inc., the "direct threat" language is included in the statute as a possible defense; however, it is "unclear on the face of the statute itself which party bears the burden in a 'direct threat' analysis. Construing the statute as the Fourth Circuit has in Darcangelo v. Verizon Commc'ns, Inc., 292 F.3d 181, 188 (4th Cir. 2002), the Court concludes that, [the defendant] has the burden of establishing that [plaintiff] presented a direct threat to himself or others." No. 1:09-CV-00679, 2010 WL 1779693, at *5 (E.D. Va. Apr. 30, 2010).

Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 960–61 (4th Cir. 1996) (quoting Smith

v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980)). As the Fourth Circuit has repeatedly explained, an

employment discrimination case "is not a vehicle for substituting the judgment of a court for that

of the employer." DeJarnette, 133 F.3d at 298–99 (internal quotation marks omitted).

Plaintiff would like to make this civil action an inquest into the professional histories of

the Agency's medical experts Drs. Blanks and Prunier. This line of debate is irrelevant. The issue

in this case is not whether the opinions offered by the medical experts were "true" but whether

the employer's beliefs about plaintiff's condition were honestly held. See id. at 299 (citing

Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 411 (7th Cir. 1997), for the

proposition that the "employee must present evidence reasonably calling into question the

honesty of his employer's belief; employee's mere demonstration that his employer's belief may

be incorrect is not sufficient to prove discrimination"). "An employer's proffered legitimate basis

for an employment action is considered honestly held if the employer can establish its reasonable

reliance on the particularized facts that were before it at the time the decision was made. The

employer does not need to show that it conducted a perfect investigation; rather, the employer's

decision need only be 'reasonably informed.'" Tomasello, 2016 WL 165708, at *11 (citing

Murphy v. Oh. State Univ., 549 Fed. App'x. 315, 322 (6th Cir. 2013)) (emphasis in original); see

also Darnell v. Thermafiber, Inc., 417 F.3d 657, 660 (7th Cir. 2005) (holding that an employer's

determination that a person cannot safely perform his job functions is objectively reasonable

when the employer relies upon a medical opinion that is itself objectively reasonable). As the

Court explained in its September 23, 2016 order denying plaintiff's subpoena requests for

documents regarding the professional records of the aforementioned doctors, "In 2012, the time

of the events at issue, both Drs. Prunier and Blanks had active medical licenses. . . . Therefore, in

2012, the Agency's reliance upon the professional opinions of Drs. Prunier and Blanks was reasonable, and any subsequent or then-undisclosed issues regarding their qualifications are immaterial." [Dkt. No. 50].

The issue currently before the Court is whether the defendants honestly believed that at the time of plaintiff's proposed termination he was "unable to perform the duties and functions of [his] position [as of April 30, 2012] and for the foreseeable future," Removal Proposal, Def. Ex. P. [Dkt. No. 51-16] at 2. On this issue, there are no material facts in dispute. Plaintiff does not dispute that the Agency's description of the qualifications for the CBPO were correct or that the Agency's medical experts considered those qualifications in reaching their decision. And plaintiff has failed to introduce any evidence whatsoever, either of pretextual or impermissible motives or that his disability could have been accommodated. In addition, although plaintiff disputes the accuracy of their findings, the parties agree that the two psychiatrists whose consults were commissioned by the Agency found plaintiff not fit for duty, while the four evaluations submitted by the plaintiff, only one of which was before the Agency when it made its decision, found him fit for duty.

Plaintiff's argument that the "competing expert opinions as to material facts . . . . preclude the grant of summary judgment," Pl. Opp. at 4, is incorrect. Where the record contains competing expert opinions, it is not for the court to supplant its judgment for that of the employer or determine which opinion is more persuasive; instead, "the place of the court in such cases is to make sure that the decision-maker has reasonably considered and relied upon sufficient evidence specific to the individual and the potential injury." Knapp v. Nw. Univ., 101 F.3d 473, 484 (7th Cir. 1996). This conclusion was endorsed by the Fourth Circuit in Class v. Towson Univ., 806 F.3d 236, 249 (4th Cir. 2015). There, an NCAA football player who had suffered life threatening

28

heatstroke challenged the university's decision not to clear him to return to competition. When reviewing the athlete's attack on the team physician's medical conclusion that the athlete could not safely compete, the Fourth Circuit explained, "It is not our role to agree or disagree with [the team physician's] opinion or to weigh whether her evaluation is more persuasive than another doctor's. Rather, we are to determine whether her professional judgment was supported by the record." Id. at 249. As the Court went on to elaborate, "the standard is whether her judgment was reasonable—i.e., whether it was individualized to [the plaintiff], was reasonably made, and was based on competent medical evidence." Id. at 251.

The medical opinions of Drs. Blanks and Prunier amply meet this standard. Dr. Blanks' findings were based on his 1.5 hour in-person interview with plaintiff, the results of plaintiff's MMPI-2, and his review of the available documents. Relying on the diagnostic criteria set forth in the DSM-IV-TR—according to which a patient meets the criteria for Major Depressive Disorder when he exhibits five or more of the nine enumerated symptoms during the same two week period—Dr. Blanks concluded that plaintiff exhibited eight of the nine symptoms. [Dkt. No. 51-6] at 8-9. Dr. Prunier, the Agency's contracted Medical Review Officer, reviewed the report provided by Dr. Blanks and concluded that it was both "credible and complete." [Dkt. No. 51-8] at 1. Relying on the individualized information provided by Dr. Blanks, Dr. Prunier concurred that plaintiff was psychiatrically not fit for duty and further concluded that plaintiff could not be trusted to efficiently and effectively perform even light duty functions that involved independent decision-making or national security implications. Id. at 2. As Dr. Prunier testified before the MSPB, this conclusion was based on his experience completing 750 such reviews, Prunier Tr. [Dkt. No. 51-15] at 447:12-13, familiarity with the positions at the Agency, id. at 452:7-22, and analysis under the DSM-IV-TR criteria, id. at 459:13-4601; 479:19-480:8.

29

The record indicates that the Agency credited Drs. Blanks and Prunier's opinions that plaintiff was not fit for duty because he had a medical condition that undermined his judgment and trustworthiness. According to the Agency, the ability to "make highly significant judgments and utilize good decision-making skills in relation to the management and coordination of identifying potential terrorists and instruments of terror," to "respond rapidly and appropriately to changing initiatives and threats," and to "carry a weapon and maintain demonstrated proficiency with the use of a firearm as well as non-deadly force," are essential functions of a CBPO. Apr. 30, 2012 Proposal, Def. Ex. P [Dkt. No. 51-16] at 2. This assertion is entitled to deference,[12] and is well supported by the position description and medical evidence and plaintiff has failed to produce any evidence contradicting defendants' characterization of the qualifications required for the CBPO position.

Dr. Blanks' report, endorsed by Dr. Prunier, makes it clear that plaintiff lacked those skills: his judgment and insight were poor, as evidenced by the inflammatory comments he repeatedly made at work and his failure to acknowledge both his own communication problems and role in causing the circumstances of his frustration, and his "escalating and cumulative anger could cause him to act out in threatening ways either to himself or to others." [Dkt. No. 51-6] at 9. In addition, plaintiff had failed to seek out any mental health treatment. Thus, based on the reasonable medical evidence before it, as well as plaintiff's own representations and history of suicidal remarks, as verified by coworkers, Smith and Danzo, it was reasonable for the Agency to regard plaintiff as unsuited for the CBPO position and all other jobs which would require the performance of similar tasks under similar conditions.

---

[12] "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential." 42 U.S.C. § 12111(8).

Although Drs. Roemersma, Seth, Fisher, and Kerman disagreed with Drs. Blanks and

Prunier, only the opinion of Dr. Roemersma was before the Agency when it made the decision to

terminate plaintiff's employment and, as explained above, that disagreement does not undermine

the reasonableness of the Agency's reliance on Drs. Blanks and Prunier's medical opinions.

Furthermore, the Agency had good reason to discount the opinion of Dr. Roemersma, Removal

Letter, Def. Ex. P [Dkt. No. 51-16] at 3, and the MSPB had good reason to discount the new

submissions from Drs. Seth, Fisher, and Kerman, MSPB Order [Dkt. No. 20-2] ¶ 14. As

recognized by the Agency and the MSPB, each of these assessments was plagued by inconsistent

representations by the plaintiff, the doctors' failure to address the findings of Dr. Blanks, and

their failure to address the criteria for a fitness for duty evaluation.

The most pervasive defects in these reports are the deep inconsistencies between the

representations plaintiff made to Dr. Blanks and those he made to the four doctors he hired. This

contrast is most apparent in Dr. Roemersma's report. According to Dr. Roemersma, plaintiff

reported meeting with the EAP "one to two times and discussed marital issues, but he did not

find it helpful and stopped attending." [Dkt. No. 51-10] at 2. This statement contradicts

plaintiff's statements to Dr. Blanks that his earlier visits to the EAP were precipitated by job

dissatisfaction and concerns about an eating disorder. [Dkt. No. 51-6] at 6. And, even though Dr.

Roemersma observed that plaintiff was demonstrating healthier lifestyle choices, including

undergoing stomach surgery in an attempt to lose weight, [Dkt. No. 51-10] at 4, she did not

mention his dramatic weight gain the previous year, [Dkt. No. 51-6] at 6, which suggests that

plaintiff may have withheld this salient information. In addition, although plaintiff was not able

to name any non-work friends in his interview with Dr. Blanks and represented to Dr. Blanks

that he spent his time outside of work at home, [Dkt. No. 51-6] at 7, plaintiff told Dr.

31

Roemersma that his leisure activities included riding a motorcycle, spending time with friends, and doing volunteer work. [Dkt. No. 51-10] at 2.

Plaintiff also made contradictory representations to his other doctors, including Dr. Fisher, who acknowledged that plaintiff's answers on the MMPI-2 were "unrealistically virtuous," Def. Ex. R [Dkt. No. 51-18] at 23, and several answers plaintiff provided to Dr. Fisher were similarly suspect. For example, plaintiff claimed he was a 9 out of 10 on anxiety (where 10 is the least anxious), despite Dr. Fisher having identified "significant psychosocial stressors" in plaintiff's life, including his wife's struggle with cancer, his recent job loss, and inadequate finances, calling into question the truthfulness of plaintiff's representation about not being anxious. Id. at 19, 26. Plaintiff claimed he was a 10 out of 10 on depression (where 10 is the least depressed) and yet, according to Dr. Fisher's MMPI-2 test, "pronounced complaints of depressed mood and low morale might become more prominent" on retesting. Id. at 19, 24. Plaintiff claimed he was a 9 out of 10 on self-esteem, but admitted that he had a lot of insecurity, id. at 20, an obvious contradiction. Plaintiff characterized himself as an optimist and yet the MMPI-2 indicated that he had "cynical views about life" and "any efforts to initiate new behaviors may be colored by his negativism." Id. at 20, 24. Taken together, these inconsistencies between plaintiff's self-assessment and his overall presentation undermine the credibility of his representations to Dr. Fisher and, by extension, the entire evaluation.

Beyond these inconsistencies, with the exception of Dr. Fisher,[13] none of plaintiff's doctors adequately addressed the findings made by Dr. Blanks. Dr. Roemersma attempted to

---

[13] Dr. Fisher did engage critically with Dr. Blanks' report. His criticisms, which are set forth in detail above, largely argue that Dr. Blanks' diagnosis was incorrect because plaintiff represented that his mood was "pretty good" on the day of his evaluation and he had no prior documented history of depression. Whatever force these critiques might have, they do not address Dr. Blanks' specific findings about plaintiff's persistent anger, poor judgment, and instability. In addition,

explain away Dr. Blanks' diagnosis by reasoning that plaintiff's "elevated levels of depression" in his meeting with Dr. Blanks resulted from plaintiff having recently been asked to leave his job. [Dkt. No. 51-10] at 3. In fact, when plaintiff met with Dr. Blanks he had only been placed on light duty pending the results of his fitness for duty evaluation and was still working for the Agency. It was not until late April, shortly before plaintiff's session with Dr. Roemersma, that he learned he was being placed on administrative leave and would likely be terminated. Therefore, Dr. Roemersma's explanations for the inconsistency in plaintiff's presentation is unpersuasive. Further, the psychosocial stressors that Dr. Seth posited as the source of plaintiff's "transient" symptoms—a mundane job, irregular sleep patterns, etc., [Dkt. No. 51-14] at 2, were endemic to the CBPO position and were likely to recur were plaintiff reinstated to the position. Similarly, Dr. Kerman relied on Drs. Roemersma and Seth's conclusion that plaintiff was not depressed or suicidal without addressing Dr. Blanks' conclusions, and failed to analyze evidence in his own report that plaintiff had repeatedly made suicidal comments to his colleague Danzo, comments that dated back to 2007. [Dkt. No. 51-19]. These failures undermine Dr. Kerman's conclusion that plaintiff did not exhibit suicidal ideation.

Lastly, several of the reports fail to substantiate their conclusions that plaintiff was mentally sound and fit to return to duty. Dr. Roemersma's report, the only one submitted to the Agency before plaintiff's termination, is a suicide assessment not a fitness for duty evaluation. [Dkt. No. 51-10] at 1. As such, it does not discuss the position requirements of a CBPO or address the specific questions to which Dr. Blanks was asked to respond. Instead, it states that its

---

Dr. Fisher acknowledged that there was a "marked inconsistency" between Dr. Blanks' evaluation and Dr. Fisher's evaluation of plaintiff; however, Dr. Fisher appeared to attribute any inconsistency in the two evaluations to "information supplied by Dr. Blanks" and did not consider whether the plaintiff made inconsistent statements, raising questions about the objectivity of Dr. Fisher's analysis.

purpose was to assess the plaintiff's "emotional state and risk of suicidal ideation, plan, or intent." Id. But, the question before the Agency was not simply whether plaintiff was suicidal; instead it was whether he was fit for duty as a CPBO. Dr. Roemersma's conclusion that he was not suicidal is not sufficient to establish that he was psychiatrically fit for duty.[14] Similarly, Dr. Kerman performed a psychological evaluation that paid only glancing attention to the fitness for duty questions. [Dkt. No. 51-19]. Lastly, neither Drs. Roemersma nor Kerman, who were clinical psychologists, met the Agency's requirement that those conducting a mental health fitness for duty evaluation had to be psychiatrists certified by the American Board of Psychiatry and Neurology, as were Drs. Blanks and Prunier. Shaler Aff. ¶ 14.

In light of these infirmities in the evaluations of the doctors hired by plaintiff, it was reasonable for both the Agency and the MSPB to afford greater weight to the evaluation performed by Dr. Blanks. And, due to Dr. Prunier's long history of consulting with the Agency and his intimate familiarity with the job requirements of a CBPO and the unique stressors the position entailed, the Agency reasonably afforded his assessment of plaintiff's fitness for duty greater weight than that of plaintiff's doctors.

---

[14] During oral argument and in his papers, plaintiff emphasized that his comment on January 18, 2012 was a joke, an example of his dark humor. Even if plaintiff's characterization of the statement were true, he was not terminated for making a dark joke or because the Agency determined that he was suicidal. Plaintiff's January 18 comment precipitated an inquiry into his psychiatric state and this inquiry led the Agency to conclude that plaintiff was psychiatrically unstable and unable to exercise the good judgment, rapid response, and weapons-handling required of a CBPO, which resulted in his termination. Removal Proposal, Def. Ex. P [Dkt. No. 51-16] at 2. In addition, Drs. Blanks and Prunier concluded that plaintiff's suicidal comments, even if stated as jokes, were indicative of both suicidal ideation and poor judgment. Blanks Tr. 98:4-100:19 (explaining that plaintiff's language about suicide constitutes passive suicidal ideation); Prunier Tr. 513:9-13 (explaining that plaintiff's comment that he should have contemplated suicide represents suicidal ideation). In fact plaintiff's own doctor, Dr. Fisher, found that plaintiff "has demonstrated lapses in judgment, specifically by verbally interacting inappropriately at work." Def. Ex. R [Dkt. No. 51-18] at 22.

On this record, there was ample evidence supporting the Agency's conclusion that plaintiff was not qualified to perform the essential functions of a CBPO. In addition, Plaintiff failed to identify any accommodations that would have allowed him to perform in that position. Moreover, notwithstanding its conclusion that plaintiff was not qualified to serve as a CBPO, it is uncontested that the Agency attempted to offer plaintiff alternative employment opportunities, one of which might eventually have reached the GS-12 level. Plaintiff declined both positions, arguing that they were below his abilities and that his disqualification from the CBPO position was without merit. Nov. 19, 2012 Letter, Def. Ex. BB [Dkt. No. 66-9]. Having failed to prove that the Agency's assessment of his qualifications was unfounded, plaintiff cannot establish that these alternative positions were inadequate accommodation.

As to the third element of the Tyndall test, unlawful discrimination, "[a]lthough the Act forbids discrimination based on stereotypes, an employer is entitled to make employment decisions based on the actual attributes of the handicap." Teahan v. Metro–North Commuter R.R. Co., 951 F.2d 511 (2d Cir. 1991). Here, plaintiff's termination was not based on the mere fact that he had been diagnosed as suffering from a Major Depressive Disorder or stereotypes about depression. Instead, it was based on the individualized findings that plaintiff's particular symptoms, attitude, and perceptions made him unstable, untrustworthy, and potentially threatening. Further, the Agency's offering plaintiff two positions that it determined were within his capabilities—as established by his fitness for duty evaluation and resume—undermines any claim that his termination from employment was discriminatory. Therefore, plaintiff also fails to establish the third element of his discrimination claim.

35

## V.   CONCLUSION

For the reasons stated above, defendants' Motion for Summary Judgment [Dkt. No. 51]

will be granted by an appropriate Order to be issued with this Memorandum Opinion.

Entered this _27_ day of January, 2017.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

36